CHIASSON, Judge.
These are consolidated actions for damages resulting from the drowning deaths of Larry Davis and Greta Denice Carter. Plaintiff in the suit for the death of Larry Davis (No. 14,474) is his former wife, Mrs. Mary Jones, who divorced Mr. Davis and remarried (whether before or after the death of Mr. Davis is unclear). Mrs. Jones brought the suit in her individual capacity and as confirmed natural tutrix of the three minor children born of her marriage to Mr. Davis, namely, Larry Davis, Jr., born September 19, 1967, DeJuan Davis, born June 19,1969, and Roy Jevaugh Davis, born September 7, 1980. Plaintiffs in the suit for the death of Greta Denice Carter (No. 14,-473), a minor aged 10 at the time of her death, are her adoptive parents, Naomi Carter and William E. Carter. Defendants in both suits are the State Department of Transportation and Development (DOTD), the Parish of East Baton Rouge, and the City of Baton Rouge. Also named as defendant in the suit brought by Mr. and Mrs. Carter is State Farm Insurance Company (or State Farm Mutual Automobile Insurance Company, to correct the name incorrectly given in the Carters’ petition), the motor vehicle liability insurer under separate policies of Larry Davis and of William Carter, respectively, both policies providing uninsured motorist coverage.
The trial court dismissed with prejudice all of the above named plaintiffs’ suits, after trial on the merits. It rendered judgment in favor of Naomi Carter and against the Estate of Larry Davis in the sum of $25,000.00, and in favor of William E. Carter and against the Estate of Larry Davis in the sum of $25,000.00.
At the outset, we note that the Estate of Larry Davis w,as not made a party defendant in the suit brought by Mr. and Mrs. Carter, and hence the judgment against the Estate of Larry Davis was in error, and must be reversed.
We affirm the judgment of the trial court in all other respects for the reasons given below.
The drownings took place as the result of Larry Davis’ apparently driving past barricades erected to close Interstate 110 and encountering deep water while driving the car under a railroad trestle on the said Interstate highway. There were no witnesses to the tragic course of events, but apparently Mr. Davis and Greta got out of the ear, walked into still deeper water under the railroad trestle, and drowned.
Heavy rains fell in the Baton Rouge area beginning Friday, April 20, 1979. We do not know the exact amount of rainfall, as the rainfall amount is not in the record, either in the form of National Weather Service records or less formal records. However, the rain seems to have been of a nature and extent encountered only once a decade or even less frequently. The rains did not cease until Sunday, April 22.
Many of the streets and highways in East Baton Rouge Parish were flooded, and some homes were flooded. Among other roadways, 1-110 began to flood under the railroad trestle near the Governor’s Mansion. The dip in 1-110 at the railroad trestle is drained in times of heavy rain by a pump, which empties the water into a canal which in turn drains into Capitol Lake. Capitol Lake is drained into the Mississippi River, by pump when the water is high, as it was at the time. During the rain in question, Capitol Lake approached flood stage, as the *347 pump into the Mississippi River could not accomodate the heavy downpour. The evidence established that the pumps on Capitol Lake were not able to keep up with the flood waters being pumped into the lake and draining into the lake from other areas, as a result of which there was the danger of the lake seriously overflowing. Some of the overflow would have backed up onto this section of Interstate 110, it was feared, and could have shorted out the electrical pumps on the said Interstate. There was also testimony showing that due to high level of water in the lake and on the 1-110 the two pumps were recirculating most of the water, and that the rapidly rising waters in Capitol Lake threatened immediate flooding of the Capitol Lake pump. This in turn would have shorted out that pump and led to the flooding of a large section of northern and downtown Baton Rouge and would, of course, have increased the flooding at the 1-110 railroad trestle. In order to prevent the greatest damage the decision was made by the officials of East Baton Rouge Parish and the Department of Transportation and Development to stop the 1-110 pumps and close off I — 110 in both directions. The responsible officials came to the conclusion that without the additional drainage into Capitol Lake from the 1-110 area, the Capitol Lake pumps could handle the overflow into the lake and prevent the lake from continuing to overflow or back up onto the said highway.
At the underpass, 1-110 runs east and west, although it is generally a north-south highway. At the point of the tragic accident, the northbound lane runs east. Larry Davis’ automobile was found facing east in the northbound lane, slightly to the west of the railroad trestle itself, as the descent for the underpass began. Thus, only the manner of closure of the northbound traffic of 1-110 is of direct interest to us in this case. Going northbound, 1-110 was closed by the placing of Type I barricades (a sawhorse type barricade made of wood painted alternately orange and white) completely across 1-110 at Florida Boulevard. The entrance ramps between Florida Boulevard and the underpass were closed by Type I barricades as well. Police cars with flashing lights were placed on 1-110 at Florida Boulevard, but no police cars, policemen, highway patrolmen, or flagmen were placed at the entrance ramps between Florida Boulevard and the underpass. Ruts were found where vehicles had gone across the curb to get past the barricades, and some barricades were moved. The barricades were checked approximately every two hours by officers of the City-Parish or the DOTD.
On Sunday, April 22, 1979, Larry Davis drove with Greta, his niece, and Frances Harris, his common-law wife, to Woodville, Mississippi. Ms. Harris works the night shift at the telephone office in Baton Rouge. After returning to Baton Rouge, Mr. Davis went to his apartment and then drove with Ms. Harris to the telephone company office which is at 333 North 6th Street, Baton Rouge. Greta went with them. Mr. Davis dropped Ms. Harris at 9:55 p.m., and told Ms. Harris he was going to take Greta home, who lived with her adoptive parents in Baton Rouge. His customary route took him left on Florida, down to 10th Street to the Interstate, then in the northbound lane to the Plank Road exit, then home to Greta’s parents. No witness at the trial saw Mr. Davis or Greta alive after Ms. Harris was left at the telephone company office.
Mr. Davis’ car was found Monday, April 23, 1979, with water halfway up the seats, the doors closed, on I — 110 in the northbound lane west of the railroad trestle near the Governor’s Mansion. Nothing was found in the car. The northbound and southbound lanes of I — 110 are separated by a wire mesh fence at the railroad trestle. East of the railroad trestle, Greta’s shoe was found caught in the wire mesh fence.
Dragging operations were commenced at the railroad underpass which was partly flooded. Mr. Davis’ and Greta’s bodies were discovered in the flood waters at the underpass. A sample of Mr. Davis’ blood was obtained from his body, and was found to have .14 alcoholic content.
*348 LIABILITY OF THE DOTD, PARISH OF EAST BATON ROUGE, AND CITY OF BATON ROUGE
Plaintiffs contend, basically, that the DOTD, Parish of East Baton Rouge, and the City of Baton Rouge should be held liable for negligence in improperly designing 1-110 and the underpass drainage pumps, in cutting off the pumps, in putting up improper and inadequate barricades, in failing to post personnel at the barricades, in failing to give proper warning at the barricades in the form of flares or signs, and in failing to erect additional barricades at the point of flooding. Also, plaintiffs contend that the above-named defendants are strictly liable under LSA-C.C. art. 2317, citing the recent Louisiana Supreme Court case of Dorry v. LaFleur, 399 So.2d 559 (1981).
We cannot know precisely what route Mr. Davis took to arrive at the point where he encountered the flooded underpass. All we know is that 1-110 was barricaded at Florida Boulevard and all entrance ramps north of that point were barricaded by Type I Barricades.
It appears that there are three types of barricades. Type I are large sawhorse-type barricades striped alternately orange and white used to close roadways temporarily. Type II are smaller A-frame barricades used to block temporary work or construction, such as manholes that are open. Type III barricades are used to block roads or bridges on a long-term basis, usually because they are involved in a construction project. They are mounted in the ground through posts or firmly secured by sandbags.
Experts on highway safety and engineering were called by both plaintiffs and the defendant governmental bodies. Dr. Brenner testified for plaintiffs and Dr. Ned Walton[1] for the governmental bodies. It appears from the testimony of both that there is a federal and state manual on highway safety and both recommended Type I barricades be used for temporary closings such as closings by floods. However, Dr. Brenner testified these manuals set forth only minimum requirements, and that Type III barricades should have been used.
Dr. Brenner’s recommendation is not practical. Type III barricades are designed for long-term closing, and to. require the use of that type of barricade, which has posts firmly secured to the ground, would place an unduly heavy burden upon road crews, especially if many highways were flooded, as was the case here. Type III barricades were not suitable for emergencies, it is obvious. Type I barricades were clearly the type dictated by established usage and by common sense.
It is clear that Dr. Brenner’s other recommendations — that flashing lights or smudge pots of some sort should have been placed at the barricades, that flagmen should have been placed at the barricades, that barricades should have been erected at the point of flooding, and that sandbags should have been placed on barricades — were neither prescribed by custom or the manual nor practical under the circumstances. The barricades were designed to be “retroreflec-tive”, so the use of flashing lights or smudge pots would have effected no significant additional benefit, while entailing unnecessary effort on the part of an already overtaxed highway crew. We do not know how Mr. Davis traveled to the flooded portion of the Interstate. Police cars with flashing lights were posted at the Florida Boulevard barricades. While no flagmen were posted on the entrance ramps to 1-110 at the other barricades, it would have been impossible to post flagmen at every barricaded roadway in the area. Flooding was widespread. It was not customary or required by the manual to post more than the initial set of barricades. Furthermore, if Mr. Davis ignored the initial barricade, especially in view of the alcoholic content of *349 his blood, it is unlikely he would have heeded barricades positioned at the underpass. The use of sandbags to prevent barricades from being moved was contrary to the manual and harmful to the purpose of barricading the Interstate, as placing sandbags on the top of barricades would have made them top-heavy.
Nor was there a proper sign to post on the barricades or adjacent to them. The sign most nearly appropriate was “Road Closed”. However, testimony indicated a “Road Closed” sign should only be used when the road closure was of a relatively long-term nature. Furthermore, a “Road Closed” sign would not have indicated the closure of 1-110 more forcefully than the barricades themselves.
It is apparent that the accident resulted solely from Mr. Davis’ traveling past one of the barricades. The barricades were correctly posted. We find no negligence on the part of the DOTD, the Parish of East Baton Rouge, or the City of Baton Rouge in erecting the barricades. Rather, the proximate cause of the accident was Mr. Davis’ recklessness in ignoring proper warning furnished by the barricades. There can thus be no liability on a theory of negligence.
Under the theory of strict liability, plaintiffs argue the condition of the highway constituted a defect in a “thing” defendant governmental bodies had in their custody. However, that argument is without merit for the reason that the alleged defective portion of the highway was closed to all traffic. It is true that Dorry v. LaFleur, supra, imposed strict liability on a skating rink owner, the floor of whose rink was known to have water on it in two places. The patron fell in a third puddle of water while roller-skating. The owner had failed to close the rink. The case states that the doctrine of contributory negligence per se is not a defense to strict liability, but rather a must have known (of the defect) test to be applied. However, in Dorry, unlike the present case, the premises containing the defective thing were still open to the public. In our case, the highway was closed. If we apply the “must have known” test, clearly Davis, seeing the barricades, must have known that danger faced him if he went past the barricades. We do not think that reason or justice requires us to extend strict liability to cases in which the allegedly defective “thing” is closed to the public with adequate notice. The premises were closed to the public with proper and indisputably clear notice by the erecting of barricades. Hence, there can be no strict liability.
Having reached the conclusions stated above, it is unnecessary to decide whether or not the highway was improperly designed or the pumps improperly turned off. The proximate cause of the accident was Davis’ driving past the barricades.
We find the DOTD, the Parish of East Baton Rouge, and the City of Baton Rouge free from liability, and affirm the judgment of the trial court in so holding.
LIABILITY OF STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
Larry Davis and William Carter each had policies of automobile liability insurance issued by State Farm with policy limits of $10,000 each person, $20,000 each occurrence. The Carters contend that if it is assumed that Larry Davis was negligent, then State Farm is liable for Greta’s drowning as liability insurer of Mr. Davis and uninsured motorist insurer of Mr. Carter. The policies in providing basic liability coverage state that the insurer is obligated to pay all sums up to the policy limits that the insured is obligated to pay for bodily injury including death “arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile... ”, and in providing uninsured motorist coverage state the insurer is obligated to pay any sums an uninsured (underinsured) motorist is obligated to pay because of bodily injury including death “arising out of the ownership, maintenance or use of such uninsured automobile...”
*350 In a recent case, Sherville v. National Union Fire Ins. Co., 387 So.2d 1181 (La.App. 1st Cir. 1980), this Court quoted with approval the following language found in a Third Circuit case, Baudin v. Traders & Gen. Ins. Co., 201 So.2d 379 (1967), writ refused, 251 La. 224, 203 So.2d 557 (1967), setting forth the test to be applied in determining whether or not an accident resulted from the “use” of an automobile:
“(1) The dangerous situation causing injury must have its source in the use of the automobile; (2) The chain of events resulting in the accident must originate in the use of the automobile and be unbroken by the intervention of any event which has no direct or substantial relation to the use of the vehicle; (3) The accident must be a natural and reasonable incident or consequence of the use of the vehicle for the purposes contemplated by the policy, although not necessarily foreseen or expected; (4) The accident must be one which can be ‘immediately identified’ with the use of the automobile as contemplated by the parties to the policy; (5) The accident must be of a type reasonably associated with the use of the automobile as contemplated by the contracting parties; (6) The accident must be one which would not have happened ‘but for’ the use of the automobile.” (201 So.2d 379, 384, 385)
We find that criterion (2) is crucial and not present in the present case, just as it was absent in Sherville, because there was a break in the chain of causation.
The trial court in the case now before us found, in written reasons for judgment, that the accident resulted from the fact Davis and Greta had left the automobile and proceeded on foot into deeper water.
Thus, the death of Greta resulted not from the use of the automobile, but from the decision of Davis, or Greta, or both, to attempt to traverse deeper water. The chain of causation that originated in negligently driving past the barricade was broken by the action of Davis and Greta, in no direct way connected with the use of the automobile, in attempting to traverse still deeper water after alighting from the automobile.
The trial court’s conclusion is well supported by the record. Greta’s shoe was found in the mesh fence dividing the northbound and southbound lanes of the highway, at a point beneath which the flooding on the highway was deeper than the waters in which the automobile was found. Apparently, Greta attempted to walk along the elevated median to the Interstate and was swept out of her shoe, or lost her grip on the fence. The doors on the car were found to be locked by former Chief of Police Kidder, suggesting the flight from the automobile was deliberate and considered rather than hasty. (There was other testimony that the doors were unlocked, but obviously the trial court, who had the benefit of observing the demeanor of witnesses, believed Kidder. We cannot say that the trial court abused its broad discretion in evaluating the testimony of witnesses in accepting Kidder’s testimony as true.) The trial court found that it was evident that Davis and Greta got out of the car and locked the doors. It reasoned that the car had been driven into several feet of water and the engine had stalled, and that Davis’ blood alcohol content of .14 was responsible in whole or in part for his inability to cross the flooded area on foot. In addition, Davis had bad legs as the result of having been struck by a car many years before, which the trial court stated might have contributed to the drownings.
Thus, in sum, the trial court appears to have found that the chain of causation involving use or misuse of the automobile was broken by the further negligent action of Larry Davis in attempting to traverse still deeper water with Greta. In that conclusion, we cannot say it was clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Accordingly, the judgment of the trial court dismissing State Farm is affirmed.
The judgment of the trial court is affirmed in all respects, except that the judgment rendered in favor of Naomi and Wil *351 liam E. Carter and against the Estate of Larry Davis is reversed and set aside. All costs shall be paid by plaintiffs.
AFFIRMED IN PART; REVERSED IN PART.

. Counsel for William and Naomi Carter seeks to find something nefarious in a remark made by the trial judge to Dr. Walton that he could find out what the doctrine of the “forgiving highway” meant off the record. However, the remark read in context was made in a moment of levity during a lengthy trial and obviously was not intended to be taken seriously.